# 14-1414-cv

## United States Court of Appeals

*for the*

## Second Circuit

WELLS FARGO BANK, N.A., as Trustee for the Registered Holders of
J.P. Morgan Chase Commercial Mortgage Corp., Commercial Mortgage Pass-
Through Certificates, Series 2002-CIBC4, acting by and through its
Special Servicer, LNR Partners, LLC,

*Plaintiff-Appellant,*

– v. –

JPMORGAN CHASE BANK, N.A.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

GREGORY A. CROSS
COLLEEN M. MALLON
VENABLE LLP
*Attorneys for Plaintiff-Appellant*
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 244-7400

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Appellant Wells Fargo Bank, N.A., as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Corp., Commercial Mortgage Pass-Through Certificates, Series 2002-CIBC4 (the "**Trust**"), acting by and through Its Special Servicer LNR Partners, LLC, being a private non-governmental party, hereby certifies that the Trust has no parent corporation, the Trust does not issue stock and there is no publicly held corporation that owns ten percent or more of the Trust's beneficial interests.

# **TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT  ........................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 2

ISSUES PRESENTED.......................................................................... 3

STATEMENT OF THE CASE.............................................................. 4

STATEMENT OF FACTS ................................................................... 7

A.    The Loan  ............................................................................... 7

B.    JPMorgan's Sale Of The Loan And Its Representations In The
       MLPA          ........................................................................... 8

C.    The Closure Of The Anchor Stores And Additional Events That Came
       Into Existence After The Sale Of The Loan ............................... 13

D.    The Trust's Notice And JPMorgan's Refusal To Cure Or Repurchase
       The Loan    ........................................................................... 16

SUMMARY OF ARGUMENT .......................................................... 17

STANDARD OF REVIEW ................................................................ 19

ARGUMENT         ........................................................................... 20

I.    THE MLPA EXPRESSLY STATES THAT THE TRUST HAS A
      CLAIM AGAINST JPMORGAN FOR BREACH OF ITS
      CONTRACTUAL OBLIGATION TO CURE OR REPURCHASE......... 20

II.   THE MLPA CREATES AN ONGOING OBLIGATION TO CURE
      OR REPURCHASE BY JPMORGAN ...................................... 22

8243603

III.  THE TRUST'S NOTICE/DEMAND TO JPMORGAN THAT IT
      CURE OR REPURCHASE THE LOAN IS AN ESSENTIAL
      ELEMENT OF ITS CAUSE OF ACTION ................................................24

      A.    The Demand Is Integral To The Parties' Sole Remedy
            Provision.................................................................................25

      B.    The MLPA's Bargained-For "Prompt Notice" Provision And
            The Doctrine Of Unreasonable Delay Serve As Ample
            Gatekeepers .........................................................................31

      C.    The Cases Relied Upon By The District Court In Determining
            That The Demand At Issue Was Procedural Are Inapposite ..........33

IV.   THE TRUST WAS NOT ENTITLED TO DEMAND CURE OR
      REPURCHASE WHEN JPMORGAN SOLD THE LOAN AND
      MADE ITS REPRESENTATIONS IN 2002 ............................................36

      A.    A Material And Adverse Impact Must Exist Before The
            Trust Can Make A Demand To Cure Or Repurchase .....................37

            1.    The District Court's Factual Conclusion That A
                  Material And Adverse Impact Existed In 2002 Was
                  Contrary To The Allegations Pled In the Complaint............39

            2.    The District Court's Determination On A Motion To
                  Dismiss That A Theoretical Risk Of Loss Existed In
                  2002 That Satisfied The Material And Adverse
                  Condition Was Flawed.........................................................41

            3.    The Presence Of The Language – "that would materially
                  and adversely effect" – In One Of The Representations
                  That JPMorgan Breached Is Irrelevant To The Statute Of
                  Limitations Argument..........................................................46

      B.    JPMorgan Contractually Required That It Be Given An
            Opportunity To Cure ...............................................................47

CONCLUSION   ...........................................................................48

ii

# TABLE OF AUTHORITIES

## CASES                                                                    PAGE(S)

Abbas v. Dixon, 480 F.3d 636 (2d Cir. 2007) ................................. 19, 20

Abercrombie v. Andrew College, 438 F. Supp. 2d 243 (S.D.N.Y. 2006)............ 20

ACE Sec. Corp. v. DB Structured Prods.,
    977 N.Y.S.2d 229 (N.Y. App. Div. 2013)............................................33, 34

Aetna Life & Cas. v. Nelson, 67 N.Y.2d 169 (N.Y. 1986) .................................. 36

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ................................................ 19

Assured Guar. v. Flagstar Bank, 920 F.Supp.2d 475 (S.D.N.Y. 2013)................ 30

Assured Guar. Mun. Corp. v. Flagstar Bank, FSB,
    892 F. Supp. 2d 596 (S.D.N.Y. 2012) ......................................... 45

Bano v. Union Carbide Corp., 361 F.3d 696 (2d Cir. 2004) ................................ 19

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ............................................ 19

Beller v. William Penn Life Ins. Co.,
    778 N.Y.S.2d 82 (N.Y. App. Div. 2004)....................................................23

Bice v. Robb, 324 F. App'x 79 (2d Cir. 2009) ............................................... 22, 42

Bluebird Partners, L.P. v. First Fidelity Bank, N.A., N.J.,
    671 N.Y.S.2d 7 (N.Y. App. Div. 1998)....................................................... 43

Bulova Watch Co. v. Celotex Corp., 46 N.Y.2d 606 (N.Y. 1979)................ 22, 23

Caronia v. Philip Morris USA, Inc., 715 F.3d 417 (2d Cir. 2013) ...................... 34

CitiMortgage, Inc. v. Allied Mortgage Group, Inc.,
    2012 WL 5258745 (E.D. Mo. Oct. 24, 2012)............................................. 30

<u>CitiMortgage, Inc. v. Reunion Mortgage, Inc.</u>,
2012 WL 5471165 (E.D. Mo. Nov. 9, 2012) ............................................. 30

<u>Clement v. United Homes LLC</u>, 914 F. Supp. 2d 362 (E.D.N.Y. 2012)............. 20

<u>Continental Casualty Company v. Stronghold Insurance Company</u>,
77 F.3d 16 (2d Cir. 1996) ................................................. *passim*

<u>D'Antonio v. Metro Transp. Auth.</u>,
2008 WL 582354 (S.D.N.Y. Mar. 4, 2008)................................................ 42

<u>Faulkner v. Arista Records LLC</u>,
602 F. Supp. 2d 470 (S.D.N.Y. 2009) .................................................. 23, 24

<u>Federal Housing Finance Agency v. WMC Mortg., LLC</u>,
Case No. 1:13-cv-0584-AKH (S.D.N.Y. Jan. 7, 2014) ....................... 30, 34

<u>Frigi-Giffin, Inc. v. Leeds</u>, 383 N.Y.S.2d 339 (N.Y. App. Div. 1976) ............... 26

<u>Gonzalez v. Hasty</u>, 651 F.3d 318 (2d Cir. 2011) ................................................... 19

<u>Greenwood Place, LP v. Huntington Nat'l Bank</u>,
2011 U.S. Dist. LEXIS 78736 (S.D Ind. July 19, 2011) ............................ 44

<u>Guilbert v. Gardner</u>, 480 F.3d 140 (2d. Cir. 2007) ................................................. 22

<u>Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.</u>,
18 N.Y.3d 765 (N.Y. 2012) ...................................................................... 33

<u>Howard Residential, Inc. v. Sand Canyon Corp.</u>,
2014 WL 572722 (S.D.N.Y. Feb. 14, 2014) ............................................. 45

<u>IBM Credit Fin. Corp. v. Mazda M'fg Corp.</u>,
542 N.Y.S.2d 649 (N.Y. App. Div. 1989)................................................. 31

<u>In re Bennett Funding Group, Inc.</u>, 292 B.R. 476 (N.D.N.Y. 2003) ............. 28, 30

<u>In re Musicland Holding Corp.</u>,
386 B.R. 428 (S.D.N.Y. 2008) aff'd, 318 F. App'x 36 (2d Cir. 2009)....... 43

8243603

John J. Kassner & Co. v. City of New York, 46 N.Y.2d 544 (N.Y. 1979) .... 36, 48

Kassner v. 2nd Ave. Delicatessen, Inc.,
    496 F.3d 229 (2d Cir. 2007) ................................................................ 18, 19

Kermanshah v. Kermanshah, 580 F. Supp. 2d 247 (S.D.N.Y. 2008).................. 22

Kuntsammlungen Zu Weimar v. Elicofon,
    678 F.2d 1150 (2d Cir. 1982) ....................................................................... 26

LaSalle Bank v. CIBC Inc., 2011 WL 4943341 (S.D.N.Y. Oct. 17, 2011) ... 38, 44

LaSalle Bank v. Citicorp Real Estate, Inc.,
    2002 WL 31729632 (S.D.N.Y. Dec. 5, 2002)........................................... 38

LaSalle Bank v. Nat'l Bank of Ark.,
    875 F. Supp. 2d 911 (E.D. Ark. 2012) ....................................................... 30

Lehman Bros. Holdings, Inc. v. Key Fin. Corp.,
    2011 WL 1296731 (M.D. Fla. Mar. 31, 2011 ........................................... 31

Lehman XS Trust v. Greenpoint Mortgage Fund., Inc.,
    2014 WL 108523 (S.D.N.Y. Jan. 10, 2014) ................................... 35, 37, 38

MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,
    963 N.Y.S.2d 21 (N.Y. App. Div. 2013)................................................... 45

Movado Group, Inc. v. Caseiko Trading Co.,
    912 F. Supp. 2d 109 (S.D.N.Y. 2012) ....................................................... 23

Oppenheimer & Co. v. Oppenheim, Appel, Dixon,
    86 N.Y.2d 685 (N.Y. 1995) ....................................................................... 29

Ortiz v. Cornetta, 867 F.2d 146 (2d Cir. 1989) .................................................... 20

Rossi v. Oristian, 376 N.Y.S.2d 295 (N.Y. App. Div. 1975) ......................... 29, 30

Rus, Inc. v. Bay Indus., Inc., 322 F. Supp. 2d 302 (S.D.N.Y. 2003) .................. 44

Russack v. Weinstein, 737 N.Y.S.2d 638 (N.Y. App. Div. 2002) ................ 28, 30

v

Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425 (2d Cir.1992) ........... 21

Seifert, Hirschorn & Packman v. Ins. Co. of N. Am.,
    321 N.Y.S.2d 815 (N.Y. App. Div. 1971) ................................................... 21

Structured Mortg. Trust 1997-2 v. Daiwa Fin. Corp.,
    2003 WL 548868 (S.D.N.Y. Feb. 25, 2003) ................................. 33, 34, 35

Sunoco, Inc. v. 175-33 Horace Harding Realty,
    969 F. Supp. 2d 297 (S.D.N.Y. 2013) ........................................................ 37

Syncora Guar. Inc. v. EMC Mortg. Corp.,
    874 F. Supp. 2d 328 (S.D.N.Y. 2012) ....................................................... 45

United States v. Bedford Associates, 657 F.2d 1300 (2d Cir. 1981) ................... 21

United States v. Gordon, 78 F.3d 781 (2d Cir. 1996) ............................................ 32

Valdez ex rel. Donely v. United States, 518 F.3d 173 (2d Cir. 2008) ................. 39

## **RULES**

Fed. R. Civ. P. 12(b)(6) .................................................................. *passim*

## **STATUTES**

28 U.S.C. § 1291 ............................................................................. 2, 3

N.Y. CPLR § 206(a) ....................................................................... *passim*

8243603

## PRELIMINARY STATEMENT

This breach of contract case concerns Defendant-Appellee JPMorgan Chase Bank N.A.'s ("**JPMorgan**") refusal to honor its contractual obligation to repurchase a $71 million commercial mortgage loan that JPMorgan originated and sold into the Plaintiff-Appellant Wells Fargo Bank, N.A., as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Corp., Commercial Mortgage Pass-Through Certificates, Series 2002-CIBC4 (the "**Trust**"). JPMorgan contractually agreed to cure or repurchase the loan if it breached any representation and warranty that it made with regard to the loan only after such breach materially and adversely affected the loan's value. The Trust's sole recourse for a breach that resulted in a material and adverse impact was to request that JPMorgan cure or repurchase the loan. Pursuant to the contract that JPMorgan negotiated, the Trust possessed no independent cause of action for a breach of representations and warranties until JPMorgan passed on its right to cure or repurchase.

In the event JPMorgan refused to cure or repurchase, the contract then expressly permitted the Trust to sue for JPMorgan's refusal to do so. The contract also protects JPMorgan from speculative damage claims and instead limits the Trust's recovery to the Repurchase Price formula, which calculates what JPMorgan would have had to pay had JPMorgan repurchased the loan. JPMorgan

contractually secured the right to cure or repurchase for as long as the loan is held by the Trust.

On December 23, 2010, the Trust gave JPMorgan notice that the loan at issue breached at least two representations and warranties and that those breaches had caused a material and adverse impact on the Trust in 2009 because the breaches restricted the Trust's ability to sell its collateral for the loan and severely limited loan workout options, thereby triggering JPMorgan's obligation to cure or repurchase the loan within 90 days (i.e., on or before March 23, 2011). In its January 18, 2011 response, JPMorgan refused to cure or repurchase the loan, claiming that it did not breach any representation or warranty and that there was no material and adverse impact to the Trust. The Trust filed the instant lawsuit against JPMorgan because of JPMorgan's refusal to cure or repurchase the loan. The statute of limitations on the Trust's claims began to run on January 18, 2011, when JPMorgan refused to cure or repurchase. Therefore, the Trust's claims are timely under New York law.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332 because Wells Fargo Bank, N.A., the trustee of the Trust, is a citizen of South Dakota and JPMorgan is a citizen of Ohio, and the amount in controversy exceeds $75,000 exclusive of interest and costs. This Court has appellate jurisdiction under 28

2

U.S.C. § 1291.  Notice of appeal was timely filed on April 25, 2014.  (JA 123-125).[1]

## ISSUES PRESENTED

1.     When a contract expressly provides for a cause of action for "the Seller's breach of its obligation to cure or repurchase," does the limitations period run from the date of refusal to cure or repurchase or some earlier date?

2.     When a contract precludes litigation and instead affords the counterparty to the contract a compulsory right to cure or repurchase, does the limitations period attributable to the refusal to cure or repurchase run from the date of the event triggering the right to request cure or repurchase or from the date of the counterparty's refusal to do so?

3.     When a contract requires the existence of specific elements in order for a breach of contract to be actionable (i.e., breach of a representation and warranty, such breach resulting in a material and adverse impact, a request to cure the breach that caused the material and adverse impact or repurchase the Loan within the contractually required 90-day period, and a refusal to cure or repurchase), does the limitations period run from the point in time when all of these elements exist?

---

[1] References to the Joint Appendix shall be cited as "**JA __**".

8243603

4.     Is a demand for repurchase an essential element of a claim for breach of contract when the underlying contract provides that a demand for repurchase is the sole remedy and expressly permits a claim solely for the failure to cure or repurchase and even then limits the damages that can be recovered to the repurchase price formula that would have been paid had the counterparty repurchased the loan?

5.     Can a case be dismissed under Federal Rule of Civil Procedure 12(b)(6) based upon conclusions of fact that are contrary to the allegations pled in the Complaint?

## STATEMENT OF THE CASE

In 2002, JPMorgan sold, among other loans, a $71 million commercial mortgage loan (the "**Loan**") that was deposited into the Trust.  (JA 14-15; Compl. ¶¶ 25, 31).  At the time of the sale, JPMorgan made representations and warranties ("**Representations**") about the Loan in a mortgage loan purchase agreement, which proved to be untrue and resulted in a material and adverse impact to the Trust.  (JA 14-15, 22; Compl. ¶¶ 26-29, 71).  JPMorgan agreed that, in the event that a Representation proved to be untrue and caused a material and adverse impact on the Trust, it would cure or repurchase the Loan.  (JA 41-42; MLPA § 6(d)–(e)). JPMorgan limited the Trust so that its sole remedy for breach of a Representation that caused a material and adverse effect was for the Trust to provide JPMorgan

with notice of the breach and request that JPMorgan cure the breach, and if it could not cure, then repurchase the Loan within 90 days.  (JA 42; MLPA § 6(g)). *JPMorgan further agreed that its Representations and obligation to cure or repurchase the Loan applied throughout the life of the Loan*.  (JA 44; MLPA § 14).

In December 2010, the Trust provided JPMorgan with notice that its breaches of Representations had caused a material and adverse effect.  (JA 51-55). In its January 2011 response, JPMorgan denied that any Representations were breached or that any material and adverse effect had been caused and refused to cure or repurchase the Loan.  (JA 57-59).

On August 10, 2012, the Trust filed the instant Complaint against JPMorgan in which it alleged that JPMorgan breached the contract by refusing to repurchase the Loan for which Representations about the Loan had proven to be untrue and had resulted in a material and adverse impact on the Trust.  (JA 8-23).   On November 6, 2012, JPMorgan moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the Trust's claims were barred by New York's six-year statute of limitations.  (JA 24-26).   The District Court held oral argument on January 10, 2013.  (JA 5).  In an Opinion dated March 27, 2014, the District Court granted JPMorgan's Motion to Dismiss,

dismissing the Trust's Complaint as time-barred. (JA 108-121). Final judgment was entered on March 28, 2014. (JA 122).

The District Court concluded that the Trust's claims began to accrue in 2002, when the contract was made and JPMorgan made its Representations with regard to the Loan. (JA 114-115). It concluded that the Trust was entitled to make a notice/demand on JPMorgan to repurchase in 2002 because the material and adverse condition was satisfied at that time. (JA 119). Without quoting or analyzing the contractual language at issue, the District Court rejected arguments raised by the Trust that the Trust's notice/demand on JPMorgan to cure or repurchase the Loan was an essential element of the Trust's claim and thus a substantive demand. (JA 116). The District Court did not comment on language in the governing contract that expressly stated that "no limitation of remedy is implied with respect to [JPMorgan's] breach of its obligation to cure or repurchase." (JA 42; MLPA § 6(g)). The District Court grounded its conclusion that notice/demand could have been served as early as 2002 on independent inferences from facts that were different from the allegations in the Complaint, which alleged that JPMorgan's breaches of the Representations did not result in a material and adverse impact on the Trust until 2009. (JA 117-119).

The Trust filed its notice of appeal from the final judgment on April 25, 2014. (JA 123-125).

6

## STATEMENT OF FACTS

**A.**   <u>**The Loan**</u>

Highland Mall Limited Partnership (the "**Borrower**") and American General Life and Accident Insurance Company ("**AGLA**") entered into a Ground Lease.[2] (JA 12; Compl. ¶ 13).  Pursuant to the Ground Lease, the Borrower leased a parcel of land (the "**Leased Property**") located in Austin, Texas from AGLA for a term of 99 years for the purpose of operating the inline portion of an enclosed retail shopping mall known as the Highland Mall.  (<u>Id.</u>).  The Leased Property does not include the Mall's three main anchor stores (the "**Anchor Stores**").   (JA 12; Compl. ¶ 14).

The Borrower sought refinancing for the Leased Property in June 2001 and obtained the Loan – a commercial mortgage loan in the amount of $71 million – from JPMorgan.  (JA 12; Compl. ¶ 15).  JPMorgan originated the Loan, which is secured by a Mortgage covering, among other things, the Borrower's leasehold interest in the Leased Property.  (JA 12-13; Compl. ¶¶ 16 & 20).

As the originator of the Loan, JPMorgan added a restriction to the Ground Lease, Section 5.06(a), requiring that the Leased Property be operated at all times in accordance with standards for Comparable Properties, which means "first class

---

[2] Capitalized terms used and not defined herein shall have the meaning ascribed to them in the Complaint, which can be found at JA 8-26.

regional shopping malls located in the United States (or where so stated, in Austin, Texas)" (the "**First Class Shopping Mall Restriction**"):

> Lessee shall operate and maintain the Leased Property in accordance with the prevailing standards from time to time for Comparable Properties (as that term is hereinafter defined) located in Austin, Texas (the 'Comparable Properties Standard'), at all times during the term of the lease.

(JA 13, 18; Compl. ¶¶ 17, 49).[3]  JPMorgan created a summary of the Loan in which it emphasized that the mall is anchored by the Anchor Stores, namely, Dillard's, JC Penney, and Foley's (which later would become Macy's).  (JA 14; Compl. ¶ 23).  JPMorgan acknowledged that the viability of the Leased Property was dependent on the draw power of the retail Anchor Stores:  "The [Leased Property] has a competitive tenant mix with good draw power from the anchors: Dillard's, Foley's, and JC Penney."  (Id.).  *The three Anchor Stores that constitute a critical component of the Highland Mall are not part of the collateral that the Trust controls*.  (JA 9, 13; Compl. ¶¶ 2, 20).[4]

## B.    JPMorgan's Sale Of The Loan And Its Representations In The MLPA

In April 2002, JPMorgan and J.P. Morgan Chase Commercial Mortgage Securities Corp. (the "**Depositor"**) entered into a Mortgage Loan Purchase

---

[3] JPMorgan also agreed to add Section 9.01 to the Ground Lease, which prohibits the Borrower from assigning or transferring the Ground Lease or the leasehold estate without first obtaining the consent of the Lessor, which consent may be withheld unless the assignee/transferee has a financial net worth of $50 million and owns $400 million of real estate assets in the United States.  (JA 13; Compl. ¶ 19).

[4] The operating covenants that applied to the Anchor Stores are set forth in the Restated Operating Agreement.  (JA 13; Compl. ¶ 21).

8

Agreement (the "**MLPA**") whereby JPMorgan sold commercial mortgage loans, including the subject Loan, to the Depositor to be deposited into the Trust and securitized through the issuance of mortgage pass-through certificates. (JA 14; Compl. ¶ 25).[5] Pursuant to a Pooling and Servicing Agreement (the "**PSA**") that bears the same date as the MLPA, the Depositor assigned to the Trust its rights to enforce the Representations in the MLPA and the Loan (and other loans) and Loan Documents that it purchased from JPMorgan. (JA 15; Compl. ¶¶ 31, 32).

In the MLPA, JPMorgan made certain Representations regarding the loans being assigned to the Trust, at least two of which are relevant here. (JA 14; Compl. ¶ 26). *First*, in Section (xx)(1) of Exhibit B to the MLPA, JPMorgan represented and warranted that the Ground Lease did not restrict the use of the Leased Property in a manner *that would* materially and adversely affect the Leased Property:

> such Ground Lease, . . . does not restrict the use of the related Mortgaged Property by such lessee, its successors or assigns, in a manner that would materially and adversely affect the security provided by the Mortgage; . . .

(JA 14, 18; Compl. ¶¶ 27, 51 and JA 47-48; MLPA(xx)(1)). *Second*, in Section (xxv) of Exhibit B to the MLPA, JPMorgan represented and warranted that it originated the Loan in accordance with its origination standards:

---

[5] The MLPA is governed by New York law. (JA 43-44; MLPA § 12).

> Each Mortgage Loan complied at origination, in all material respects, with all of the terms, conditions and requirements of the Seller's, or if the Seller is not the originator, then the originator's, underwriting standards applicable to such Mortgage Loan . . .

(JA 15, 20; Compl. ¶¶ 28, 59 and JA 49; MLPA (xxv)).

JPMorgan contractually agreed in Section 6 of the MLPA that, if a Representation proved to be (i) untrue and (ii) had a material and adverse effect on the Trust, it would cure the breaches or repurchase the Loan from the Trust.  (JA 41-42; MLPA § 6).  ***The Trust had no ability to sue JPMorgan for a violation of a Representation that caused a material and adverse effect*** – it solely had the contractual right to demand that JPMorgan either cure or repurchase the Loan:

> [JPMorgan's] obligation to cure any breach or repurchase any affected Mortgage Loan pursuant to this Section 6 shall constitute the ***sole remedy*** available to the Purchaser in connection with a breach of any of [JPMorgan's] representations or warranties contained in this Section 6; . . .

(JA 42; MLPA § 6(g)) (emphasis added).  <u>See</u> <u>also</u> JA 34; PSA § 2.03(d) ("Section 6(e) of each of the Mortgage Loan Purchase Agreements provides the sole remedy available to . . . the Trustee . . . with respect to any Defect in a Mortgage File or any Breach of any representation or warranty with respect to a Mortgage Loan set forth in or required to be made pursuant to Section 6").

Section 6 of the MLPA, specifically subsections (d) and (e), prescribe the cure or repurchase protocol:  If there is a breach, and it is determined that such breach materially and adversely affects the value of the Loan, then LNR, the

Special Servicer in this case, must request in writing that JPMorgan either (i) cure

the breach or (ii) repurchase the affected loan:

> (d) Pursuant to this Agreement or the Pooling and Servicing Agreement, the Seller and the Purchaser shall be given notice of any **Breach** or Defect ***that materially and adversely affects the value of such Mortgage Loan, the related Mortgaged Property or the interests of any of the holders of the Certificates therein.***

> (e) ***Upon notice pursuant to Section 2.03(b)***[6] ***of the [PSA] and Section 6(d) herein, the Seller shall, not later than the earlier of 90 days from the Seller's receipt of the notice or the Seller's discovery of such Breach or Defect***, ***(i) cure such Defect or Breach, as the case may be, in all material respects, (ii) repurchase the affected Mortgage Loan at the applicable Repurchase Price*** (as defined below) or (iii) substitute a Qualified Substitute Mortgage Loan (as defined below) for such affected Mortgage Loan (provided that in no event shall any such substitution occur later than the second anniversary of the Closing Date) and pay the Servicer for deposit into the Certificate Account, any Substitution Shortfall Amount (as defined below) in connection therewith; provided, however, that if such Breach or Defect is capable of being cured but not within such 90-day period, and the Seller has commenced and is diligently proceeding with the cure of such Breach or Defect within such 90-day period, the Seller shall have an additional 90 days to complete such

---

[6] In relevant part, Section 2.03(b) of the PSA provides:  "If any Certificateholder, the Servicer, the Special Servicer, the Paying Agent or the Trustee discovers or receives notice of  . . . a breach of any representation or warranty with respect to a Mortgage Loan set forth in, or required to be made with respect to, a Mortgage Loan by the applicable Mortgage Loan Seller pursuant to the related Mortgage Loan Purchase Agreement (a "Breach"), which Defect or Breach, as the case may be, materially and adversely affects the value of any Mortgage Loan, the related Mortgaged Property or the interests of the Trustee or any Certificateholder therein, such [party] shall give prompt written notice of such Defect or Breach, as the case may be, to the . . . the Mortgage Loan Sellers, . . . , and shall request that the applicable Mortgage loan Seller, not later than the earlier of 90 days from the applicable Mortgage Loan Seller's receipt of such notice or the Mortgage Loan Seller's discovery of such Defect or Breach, (i) cure such Defect or Breach, as the case may be, in all material respects, (ii) repurchase the affected Mortgage Loan or REO Loan at the applicable Purchase Price and in conformity with the applicable Mortgage Loan Purchase Agreement. . ."  (JA 32-33; PSA § 2.03(b)); see also JA 22; Compl. ¶ 67.

cure (or, failing such cure, to repurchase the related Mortgage Loan . . . ."

(JA 41-42; MLPA § 6(d)–(e)) (underline in original) (emphasis added).[7]  See also

JA 22; Compl. ¶ 65.  JPMorgan was obligated to cure – or else repurchase the

Loan – within 90 days of receiving written notice of such breach.  (JA 41-42;

MLPA § 6(e)).

The Trust could not deliver a notice of cure or repurchase and JPMorgan had

no obligation to cure or repurchase the Loan until there was a material and adverse

effect on the value of the Loan, the Leased Property, or the interests of the

Certificateholders.    (JA 41; MLPA § 6(d) and JA 32-33; PSA § 2.03(b)).

***JPMorgan agrees that there must be both a breach and material and adverse***

***impact on the Trust for the Trust's claims to accrue.***    (JA 95, 127-128).

JPMorgan has characterized the material and adverse impact condition as an

"***essential element***" to a repurchase claim.  (JA 95, 138-139) (emphasis added).

JPMorgan also contractually agreed that, in the event any of its breach(es) of

Representations had a material and adverse effect, it was obligated to cure or

repurchase the Loan and ***that its failure to cure or repurchase gave rise to a***

***breach of such obligation***:

> . . . . no limitation of remedy is implied with respect ***to the Seller's***
> ***breach of its obligation to cure or repurchase*** in accordance with the
> terms and conditions of this Agreement.

---

[7] Capitalized terms used in the MLPA not defined therein shall have the meaning ascribed to them in the PSA.  (JA 37).

12

(JA 42; MLPA § 6(g)) (emphasis added).

Finally, in the MLPA, *JPMorgan agreed that the Trust could rely upon its Representations and obligation to cure or repurchase the Loan for the life of the Loan until the PSA terminated*:

> The warranties and representations and the agreements made by the Seller herein shall survive delivery of the Mortgage Loans to the Trustee until the termination of the Pooling and Servicing Agreement.

(JA 44; MLPA § 14).

## C. The Closure Of The Anchor Stores And Additional Events That Came Into Existence After The Sale Of The Loan

When the Loan was sold and deposited into the Trust in 2002, the Anchor Stores at the Highland Mall were occupied by giant retailers J.C. Penney, Macy's, and Dillard's Women's Store. (JA 15; Compl. ¶ 33). These retailers occupied the anchor spaces until late 2006. (Id.). J.C. Penney was the first of the retailers to vacate its anchor space, closing down in October 2006 and selling its store to a non-retail financial company. (Id.).[8] Thereafter, Dillard's closed its anchor store in early 2009 and remained dark until the space was sold in May 2010 to a local

---

[8] Pursuant to the Restated Operating Agreement, since August 2001, just two months after JPMorgan originated the Loan, no Anchor Store owner has had any obligation to use its respective property as a retail store. (JA 13; Compl. ¶ 21). The Restated Operating Agreement also provides that the tenants and visitors of the Highland Mall have a right of access and use of the parking area until 2068; but once all three Anchor Stores no longer operate as retail stores, the Restated Operating Agreement provides for early termination of such access in September 2021. (JA 14; Compl. ¶ 22).

community college, Austin Community College ("**ACC**"). (Id.). Finally, in March 2011, Macy's closed its store and sold it to ACC. (Id.).

The closure of J.C. Penney, Dillard's, and Macy's adversely affected the Leased Property. (JA 16; Compl. ¶ 36). The viability of the Leased Property – which consists of the small stores located in the inline portion of the Highland Mall – was dependent on the strength and survival of the retail Anchor Stores nearby. (JA 16; Compl. ¶ 35). Management of the Highland Mall attributed the closure of these retail Anchor Stores as the single biggest factor influencing the inline tenants' decisions to close their stores and not renew leases at expiration. (JA 16; Compl. ¶ 36). Anchor tenants serve as essential customer draws for a mall, generate additional customer traffic for adjacent inline (i.e., non-anchor) tenants, and support the occupancy of the entire mall. (JA 16; Compl. ¶ 35).

In June 2009, the Loan was transferred to Special Servicing due to imminent default relating to inline tenancy issues.[9] (JA 16; Compl. ¶ 37). One month later in July 2009, the original Lessor under the Ground Lease, AGLA, declared a default under the Ground Lease, alleging that the Leased Property was not being operated in accordance with standards for "first-class regional shopping malls." (JA 16; Compl. ¶ 38). AGLA sent a second letter in August 2009, asserting based

---

[9] Upon the occurrence of certain events (e.g., monetary default or imminent default), the administration of the loan is transferred to Special Servicing. The Special Servicer, which acts in accordance with the servicing standard, services the loan and is responsible for dealing with the borrower until the loan is either returned to a fully performing status or liquidated (via sale of the loan, foreclosure sale or repossession and sale of the collateral).

on the same reason that a default existed under the Ground Lease and threatened to terminate the Ground Lease unless the Trust could do the impossible – operate a first class shopping mall without any retail Anchor Stores.  (JA 16-17; Compl. ¶¶ 38-40, 42).  The Trust had no ability to cure the AGLA default because it lacked any control over the Anchor Stores or their retail use and therefore could not reposition the inline portion as a "first class shopping mall."  (JA 17, 19; Compl. ¶¶ 42, 54).

On August 5, 2011, the community college ACC closed on the purchase of the former J.C. Penney anchor, which made ACC the owner of the three Anchor Stores.  (JA 15; Compl. ¶ 33).  ACC has proceeded with its plans to convert all three of the Anchor Stores to classroom use, rendering compliance with the First Class Shopping Mall Restriction an even greater impossibility.  (JA 10-11, 15; Compl. ¶¶ 5, 34).  Additionally, on August 5, 2011, ACC acquired the Ground Lessor's interest under the Ground Lease.  (JA 10-11, 15; Compl. ¶¶ 5, 33).  Seizing upon the leverage created by JPMorgan's shoddy origination of the Loan, in August 2011, ACC (as the new Lessor replacing AGLA) continued to demand that the Trust operate the Leased Property as a "first-class regional shopping mall," even though ACC was no longer using the Anchor Stores for retail use. (JA 17; Compl. ¶ 44).

Making the situation even worse, the closure of all three retail Anchor Stores by 2011 triggered the complete termination of the parties' Restated Operating Agreement, resulting in a 47-year shortening of the rights to park at the Highland Mall. (JA 17; Compl. ¶ 43). The loss of parking further limited the Trust's ability to extract any value from its collateral. (JA 20; Compl. ¶ 57). On August 7, 2012, the Leased Property was sold to ACC for $1,026,554.56 – representing an approximately $72.6 million dollar loss to the Trust. (JA 11, 17; Compl. ¶¶ 6, 45).

**D.    The Trust's Notice And JPMorgan's Refusal To Cure Or Repurchase The Loan**

Before the Trust sold the Leased Property to ACC in August 2012, the Trust provided notice to JPMorgan by letter dated December 23, 2010 (the "**Notice Letter**") of breaches of two Representations that materially and adversely affected the value of the Loan, the Leased Property, or the interests of the Trustee or any Certificateholder in accordance with Section 6(e) of the MLPA and Section 2.03(b) of the PSA. (JA 17 & 22; Compl. ¶¶ 46, 68 and JA 51-55). Specifically, the Trust notified JPMorgan that it breached the Representations contained in Sections (xx)(1) and (xxv) of the MLPA. (Id.); see also JA 18-21; Compl. ¶¶ 48-64.

In the Notice Letter, the Trust reminded JPMorgan that the MLPA obligated it to either cure its breaches or repurchase the Loan within 90 days. (JA 51-55). On January 18, 2011, JPMorgan responded to the Trust's notice, and refused to cure or repurchase within the 90 day period as it was contractually required to do.

(JA 18, 22; Compl. ¶¶¶ 47, 69, 70 and JA 57-59).  On August 10, 2012, the Trust filed the instant breach of contract claim against JPMorgan.  (JA 2).

## SUMMARY OF ARGUMENT

I.    The express language in the MLPA that JPMorgan negotiated – "no limitation of remedy is implied with respect to the Seller's breach of its obligation to cure or repurchase" – makes clear that JPMorgan's failure to repurchase the Loan gives rise to a breach (and is not only a remedy).  The limitations period for such claim does not and cannot run until JPMorgan refuses to repurchase the Loan, which it did in January 2011.

II.    JPMorgan agreed that its Representations and obligation to cure or repurchase the Loan would survive for the life of the Loan until the PSA terminated.  The MLPA created an obligation of continuing performance on the part of JPMorgan to cure or repurchase the Loan, and for which a separate breach accrues each time JPMorgan fails to perform.

III.    The Trust's notice/demand to JPMorgan that it cure or repurchase the Loan is an essential element of the Trust's cause of action against JPMorgan for breach of contract.  By the express terms of the MLPA, the Trust had no cause of action unless and until it submitted its written notice/demand and waited 90 days for JPMorgan to cure or repurchase the Loan.  This Court's decision in Continental Casualty Company v. Stronghold Insurance Company, 77 F.3d 16 (2d Cir. 1996) is

17

8243603

on all fours.  Accordingly, because the demand at issue is substantive, New York Civil Practice Law and Rules ("**CPLR**") § 206(a) does not apply and the Trust's cause of action did not begin to accrue until JPMorgan refused to cure or repurchase the Loan in January 2011.  The bargained-for "prompt notice" requirement in the MLPA serves as the agreed upon gatekeeper for the timeliness of a notice/demand to cure or repurchase.

IV.   Even if CPLR 206(a) applies to the Trust's notice/demand to cure or repurchase because it is procedural (which it is not), the right to make that notice/demand was not "complete," as required by CPLR 206(a), until JPMorgan's breaches of Representations materially and adversely affected the value of the Loan in 2009 and such breaches had gone uncured.

V.   When considering a Rule 12(b)(6) motion to dismiss, the District Court was required to accept as true the allegations pled in the Trust's Complaint and draw all reasonable inferences in favor of the Trust.  See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).  The District Court failed in this regard.  It rejected the Complaint's allegations regarding when JPMorgan's breaches caused a material and adverse impact to the Trust and improperly drew inferences against the Trust based on conclusions of fact that are contrary to the allegations in the Complaint.

18

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).   See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007) (reversing order dismissing claims in part based on statute of limitations).  To survive a Rule 12(b)(6) motion to dismiss, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A facially plausible claim is one where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "[T]he court is to accept as true all facts alleged in the complaint" and must "draw all reasonable inferences in favor of the plaintiff."  Kassner, 496 F.3d at 237.

It is well-established that the statute of limitations is an affirmative defense, and the burden is on the defendant to establish when a claim accrues.  Gonzalez v. Hasty, 651 F.3d 318, 322 (2d Cir. 2011) (reversing Rule 12(b)(6) order of dismissal on statute of limitations); Bano v. Union Carbide Corp., 361 F.3d 696, 710 (2d Cir. 2004) (holding defendant's "burden includes showing when the cause of action accrued").  The pleading requirements moreover "do not compel a litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses."  Abbas v. Dixon, 480

F.3d 636, 640 (2d Cir. 2007).  Statute of limitations defenses can only be sustained

when there is "no factual question" on the issue of accrual, see Clement v. United

Homes LLC, 914 F. Supp. 2d 362 (E.D.N.Y. 2012) (citing Ortiz v. Cornetta, 867

F.2d 146, 148 (2d Cir. 1989)), and the standard is "even stricter" on motion to

dismiss.    See Abercrombie v. Andrew College, 438 F. Supp. 2d 243, 261

(S.D.N.Y. 2006).

## ARGUMENT

### I.    THE MLPA EXPRESSLY STATES THAT THE TRUST HAS A CLAIM AGAINST JPMORGAN FOR BREACH OF ITS CONTRACTUAL OBLIGATION TO CURE OR REPURCHASE

The Trust alleged in the Complaint that JPMorgan breached the MLPA by,

among other things, failing to repurchase the Loan. (JA 22-23; Compl. ¶¶ 65-72).

JPMorgan argued that its repurchase obligation was merely a remedy and not an

independent duty that it could breach.  *Section 6 of the MLPA, however, expressly*

*provides for such a claim against JPMorgan if JPMorgan breaches its obligation*

*to cure or repurchase*:

> . . . . no limitation of remedy is implied with respect *to the Seller's*
> *breach of its obligation to cure or repurchase* in accordance with the
> terms and conditions of this Agreement.

(JA 42, MLPA § 6(g)) (emphasis added).  This language indisputably demonstrates

that JPMorgan's failure to repurchase the Loan gives rise to a cause of action for

breach.  The obligation to repurchase is not only a remedy.  The terms of the

MLPA should be enforced as written.  Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir.1992) (court interpreting a contract must "give effect to the intent of the parties as revealed by the language they chose to use").  The Trust's remedy for JPMorgan's breach of its obligation to repurchase the Loan is contractually measured by the agreed upon Repurchase Price formula, which calculates what JPMorgan would have had to pay had JPMorgan repurchased the Loan.  (JA 41-42; MLPA § 6(e)).

The above quoted MLPA language clearly shows that JPMorgan agreed that the Trust has a cause of action against JPMorgan if it breaches its obligation to cure or repurchase the Loan.  See United States v. Bedford Associates, 657 F.2d 1300, 1313 (2d Cir. 1981) (explaining that "parties to a contract are basically free to make whatever agreement they wish").[10]  Yet, in its Opinion, the District Court did not quote any language from the MLPA and thus did not even address the language at issue.  The statute of limitations for such a claim cannot begin to run until JPMorgan refuses to cure or repurchase the Loan, which it did in January 2011.  The Trust's Complaint is timely.

---

[10] Seifert, Hirschorn & Packman v. Ins. Co. of N. Am., 321 N.Y.S.2d 815, 817 (N.Y. App. Div. 1971) ("If the parties to a contract adopt a provision which contravenes no principle of public policy and is not ambiguous, the courts have no right to relieve one of them from disadvantageous terms by a process of interpretation.").

21

## II.    THE MLPA CREATES AN ONGOING OBLIGATION TO CURE OR REPURCHASE BY JPMORGAN

The MLPA creates an obligation of "continuing performance" under New York law.  As this Court has recognized, where the bargained-for agreement "requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew."  Guilbert v. Gardner, 480 F.3d 140, 150 (2d. Cir. 2007).[11]

In Bulova Watch Co. v. Celotex Corp., 46 N.Y.2d 606 (N.Y. 1979) (cited in Guilbert, 480 F.3d at 150)), the defendant warranted that its roofing materials were watertight and bonded to repair any leaks twenty-years into the future.  See id. at 608.  Similar to this case, plaintiff brought suit more than six years after entering into the agreement, claiming that the defendant breached its warranty and failed to cure, and the defendant likewise argued that the suit was untimely under the statute of limitations.  Id.  The New York Court of Appeals reversed the lower court's dismissal of the suit, holding that the time to file suit ran "each time a breach of the obligation to repair the bonded roof occurred."  Id. at 609.

---

[11] Accord Bice v. Robb, 324 F. App'x 79, 80 (2d Cir. 2009) (reversing and remanding dismissal on statute of limitations grounds where agreement to manage business may have imposed a continuing performance); see also Kermanshah v. Kermanshah, 580 F. Supp. 2d 247, 258 (S.D.N.Y. 2008) (denying Rule 12(b)(6) motion to dismiss where there was a "continuing contractual obligation that presumably existed throughout the life of the various entities to which [plaintiff] contributed capital and equity").

Likewise, here, the ***parties allocated the risks of loans by including in the MLPA a continuing performance provision*** requiring JPMorgan in the future to cure or repurchase the Loan during the life of the Loan:

> The warranties and representations and the agreements made by the Seller herein shall survive delivery of the Mortgage Loans to the Trustee ***until the termination of the Pooling and Servicing Agreement***.

(JA 44; MLPA § 14) (emphasis added). The MLPA clearly created an obligation of continuing performance on the part of JPMorgan to cure or repurchase into the future subject only to the requirement that the Trust "promptly notify" JPMorgan of any breaches that materially and adversely affected the value of the Loan or the Leased Property. (JA 42; MLPA § 6(g)).

Other New York courts have uniformly enforced continuing performance provisions even when they extend performance well beyond the life of the instant 10 year Loan. See <u>Bulova</u>, 46 N.Y.2d at 608 (enforcing 20-year provision requiring cure of warranty and bond of roof); <u>Beller v. William Penn Life Ins. Co.</u>, 778 N.Y.S.2d 82 (N.Y. App. Div. 2004) (holding insurance policy created "continuing performance" to consider risk factors every five years); <u>Movado Group, Inc. v. Caseiko Trading Co.</u>, 912 F. Supp. 2d 109, 114 (S.D.N.Y. 2012) (holding that with "continuing guaranty" of debtor "the limitations period runs from the date of each breach's accrual, not the date of the instrument"); <u>Faulkner v. Arista Records LLC</u>, 602 F. Supp. 2d 470, 478 (S.D.N.Y. 2009) (denying Rule

23

12(b)(6) motion to dismiss in part because royalties contract required "continuing obligation" that "had no set end date").

This Court should uphold the bargain made by the parties for future performance of JPMorgan's continuing obligation. Failing to enforce this continuing performance provision now would upend the calculation of risks and contractual bargain reached by these sophisticated parties.

## III. THE TRUST'S NOTICE/DEMAND TO JPMORGAN THAT IT CURE OR REPURCHASE THE LOAN IS AN ESSENTIAL ELEMENT OF ITS CAUSE OF ACTION

The District Court erred in holding that the Trust's notice/demand to JPMorgan that it cure or repurchase the Loan was "procedural" and thus governed by CPLR 206(a). (JA 116-117). The demand in this case is substantive. The MLPA language quoted above in Section I – "Seller's breach of its obligation to cure or repurchase" – bolsters the Trust's position that the demand is substantive and not procedural.

The Trust did not have a claim for breach of the MLPA unless and until the following conditions were satisfied: (1) JPMorgan's breaches of a Representation(s) in the MLPA had occurred; (2) such breaches resulted in a material and adverse effect on the Trust; (3) notice/demand was given to JPMorgan that, within the contractually required 90-day period, it cure its breaches that caused a material and adverse effect or repurchase the Loan; and (4) JPMorgan

refused to cure or repurchase the Loan. Accordingly, separate and apart from the timing of material and adverse impact and opportunity to cure (discussed <u>infra</u>), the Trust's cause of action was not complete until JPMorgan refused to cure its breaches or repurchase the Loan in January 2011.

### A.    <u>The Demand Is Integral To The Parties' Sole Remedy Provision</u>

When, as here, the demand is integral to a bargained-for remedy provision in the parties' contract, the courts treat it as a requisite element of the cause of action. The instant demand to cure or repurchase the Loan found in Section 6(e) of the MLPA is an essential element of the Trust's claims. The Trust could not sue JPMorgan for its breaches of the MLPA Representations, even after they materially and adversely affected the value of the Loan. ***Instead, the Trust's sole remedy was to request that JPMorgan cure the breaches or repurchase the Loan***:

> Each party hereby agrees to promptly notify the other party of any breach of a representation or warranty contained in this Section 6. **[*JPMorgan's] obligation to cure any breach or repurchase any affected Mortgage Loan pursuant to this Section 6 shall constitute the <u>sole remedy</u> available to the Purchaser in connection with a breach of any of [JPMorgan's] representations or warranties contained in this Section 6;*** . . .

(JA 42; MLPA § 6(g)) (emphasis added). <u>See</u> <u>also</u> JA 34, PSA § 2.03(d). JPMorgan's actionable conduct was not complete – indeed the Trust had no cause of action at all – unless and until JPMorgan failed to cure or repurchase the Loan in

January 2011.  For this reason, the demand at issue is substantive and CPLR 206(a) does not apply.

"New York courts do not instinctively apply CPLR 206(a) in every case where a demand is a predicate to suit.  Rather, they distinguish between substantive demands and procedural demands."  <u>Continental</u>, 77 F.3d at 21.  This Court explained the distinction between substantive and procedural demands:

> ***Where the demand requirement is substantive, that is, where a demand and refusal are requisite elements of the cause of action***, it accrues and the statute of limitation begins to run only after such demand and refusal.  On the other hand, where the demand is merely procedural, that is, where demand and refusal are not requisite elements of the cause of action and the ***defendant's actionable conduct was complete prior to demand***, § 206(a) of the N.Y.C.P.L.R [] governs and the limitation period begins to run when the "right to make the demand is complete."  . . . . ***Under these principles, § 206(a) does not apply to substantive demands, and in practice § 206(a)'s actual application has been extremely limited.***

<u>Kuntsammlungen Zu Weimar v. Elicofon</u>, 678 F.2d 1150, 1161 (2d Cir. 1982) (emphasis added); <u>Frigi-Giffin, Inc. v. Leeds</u>, 383 N.Y.S.2d 339 (N.Y. App. Div. 1976) (holding where "demand is of a substantive nature (i.e., an essential element of the cause of action), the statute runs only after a demand has been refused").  The focus is not on any theoretical wrong, but rather whether all of the defendant's "actionable conduct" is complete prior to the notice/demand.  <u>Kuntsammlungen</u>, 678 F.2d at 1161.

26

There are many contract cases where demands have been deemed substantive on reasoning directly applicable to this case.[12]   In the analogous decision of <u>Continental</u>, this Court held that the statute of limitations did not run until the plaintiff reported its "actual losses" per the terms of a reinsurance contract and the demand was rejected by defendant.   77 F.3d at 16.   Focusing on the contract language, the Court held that it would "construe the notice provisions to mean that [plaintiff] had to report any actual losses—payments made on its underlying insurance policies—within a reasonable period of time under the circumstances."   <u>Id.</u> at 20.   The Court rejected an argument, similar to JPMorgan's argument in this case, that the action was untimely, since the plaintiff "could have 'demanded' indemnity by giving notice of the claims" as soon as there were some losses.   <u>Id.</u> at 21.   Focusing again on the contract, the Court explained:

> [Plaintiff] had no right to indemnity under the policies until it satisfied this provision.   And, the [defendants] were not in 'breach' of their contract to indemnify until they rejected the demand (or until a reasonable time for paying the losses elapsed).   Accordingly, CPLR 206(a) does not apply.

---

[12]   In its cursory analysis, which did not even quote the relevant language from the MLPA, the District Court noted that CPLR 206(a) is inapplicable to "substantive" demands, citing as "[a] useful example [] a claim for replevin of stolen artwork from a good-faith purchaser."   (JA 115-117).   Although a claim for replevin is one example involving a substantive demand, the District Court's analysis was incomplete at best.   It glossed over substantial breach of contract case law involving notices/demands that were included in the parties' bargained-for language and that the courts deemed substantive.

Id.  Similarly, here, the Trust had no right to the *sole* repurchase remedy until it satisfied the demand provision and JPMorgan rejected the demand.

Likewise, in Russack v. Weinstein, the Second Department rejected the defendant's argument that the six-year statute of limitations had run for a contract claim for excess advances under a shareholder agreement.  737 N.Y.S.2d 638, 638 (N.Y. App. Div. 2002).  Even though the plaintiff made the excess advances between 1985 and 1990, the plaintiff did not make its demand until 1999 pursuant to a contractual provision requiring payment by the defendant within 60 days of written notice.  Id.  Upholding the parties' remedy provision, the Second Department held flatly: "The plaintiff's breach of contract claim is not time-barred, as the applicable six-year Statute of Limitations did not begin to run until 60 days after the plaintiff's written demand for payment."  Id.  Here, this Court should respect the 90-day written demand clause as the exclusive remedy provision of the MLPA as well.

Similarly, in In re Bennett Funding Group, Inc., the district court rejected application of CPLR 206(a) in an action for breach of contract of an installment note governed by a Consolidation Agreement.  292 B.R. 476 (N.D.N.Y. 2003). Focusing again on the contract remedies, the district court emphasized that "plaintiff was not entitled to sue on the entire Consolidation Agreement until it invoked the acceleration clause."  Id. at 481.  Accordingly, the court found that,

8243603

because the defendants' obligation to pay was triggered when the plaintiff exercised its option under the acceleration clause, the demand was substantive and CPLR 206(a) inapplicable. Id. Here, the Trust had no ability to sue JPMorgan until it exercised its right under the sole remedy clause requesting that JPMorgan cure or repurchase the Loan. Thus, the demand in this case is substantive and CPLR 206(a) is inapplicable.

In Rossi v. Oristian, the Fourth Department rejected the defendant's argument that the statute of limitations for an alleged breach of stock option agreement had commenced from the earliest time that the defendant sent a letter revoking the option. 376 N.Y.S.2d 295 (N.Y. App. Div. 1975). In finding that the statute of limitations did not run until the plaintiff demanded the option, the Fourth Department emphasized the express language of the agreement itself. It held that the agreement "provides that plaintiff might exercise the option at any time, [and] presents a situation where the statute of limitations does not commence to run until the person granted the option demands the Stock." Id.

In all of these cases, the courts looked to the parties' contract remedies in deciding substantive demands. This is consistent with New York's long-standing respect for and willingness to uphold bargained-for contract provisions reached between sophisticated commercial parties. See, e.g., Oppenheimer & Co. v. Oppenheim, Appel, Dixon, 86 N.Y.2d 685, 690 (N.Y. 1995). As in Continental,

29

Russack, In re Bennett, and Rossi, here the MLPA contains an express notice/demand requirement embodied as an essential element of the bargained-for contract remedy. By the express terms of the MLPA, the Trust had no cause of action—in fact, had no other remedy at all—unless and until it submitted its written notice/demand on JPMorgan and waited 90 days for JPMorgan to cure or repurchase the Loan.

The Trust's claims did not being to accrue until JPMorgan rejected the Trust's demand and refused to cure or repurchase the Loan in January 2011. See, e.g., (JA 158-159) Federal Housing Finance Agency v. WMC Mortg., LLC, Case No. 1:13-cv-0584-AKH (S.D.N.Y. Jan. 7, 2014), Dkt. 59 (holding that loan seller's contract was breached upon failure to cure or repurchase, not when the representations and warranties were made); LaSalle Bank v. Nat'l Bank of Ark., 875 F. Supp. 2d 911 (E.D. Ark. 2012) (holding in a CMBS repurchase case that demand was an element of the trustee's claim and therefore the statute of limitations did not begin to run until the demand was made and refused).[13] This Court should reverse the District Court's dismissal on this basis.

---

[13] See also LaSalle Bank v. Lehman Bros., 237 F. Supp. 2d 618, 638 (D. Md. 2002) ("Under New York law, a loan seller's failure to repurchase non-conforming loans upon demand as required by a contract is an independent breach of the contract entitling the plaintiff to pursue general contract remedies for breach of contract." (citation omitted)); Assured Guar. v. Flagstar Bank, 920 F.Supp.2d 475, 508-09 (S.D.N.Y. 2013) (same); CitiMortgage, Inc. v. Reunion Mortgage, Inc., 2012 WL 5471165, at *4 (E.D. Mo. Nov. 9, 2012) (same); CitiMortgage, Inc. v. Allied Mortgage Group, Inc., 2012 WL 5258745, at *4, 13 (E.D. Mo. Oct. 24, 2012) (same);

**B.    The MLPA's Bargained-For "Prompt Notice" Provision And The Doctrine Of Unreasonable Delay Serve As Ample Gatekeepers**

In the court below, JPMorgan presented a parade of horribles suggesting that the Trust's claim would be prolonged forever if the District Court ruled in the Trust's favor.  This hyperbole ignores both the MLPA's bargained-for terms and this Court's recognition of the principle of unreasonable delay.

The MLPA already contains a bargained-for provision requiring "prompt notice."  The MLPA's sole remedy provision states:

> Each party hereby agrees to ***promptly notify*** the other party of any breach of a representation or warranty contained in this Section 6. [JPMorgan's] obligation to cure any breach or repurchase any affected Mortgage Loan pursuant to this Section 6 shall constitute the <u>sole remedy</u> available to the Purchaser in connection with a breach of any of [JPMorgan's] representations or warranties contained in this Section 6; . . .

(JA 42; MLPA § 6(g)) (emphasis added).  <u>See also</u> JA 32-33; Section 2.03(b) of PSA.  Sophisticated financial parties like JPMorgan can and do regularly bargain for such provisions.  <u>See</u>, <u>e.g.</u>, <u>IBM Credit Fin. Corp. v. Mazda M'fg Corp.</u>, 542 N.Y.S.2d 649, 650 (N.Y. App. Div. 1989) (noting "provision of the agreement obliging [plaintiff] to ***promptly notify*** [defendant]. . . .") (emphasis added).

In <u>Continental</u>, this Court rejected an argument virtually identical to JPMorgan's in this case.  After holding that a pre-suit substantive demand was not

<u>Lehman Bros. Holdings, Inc. v. Key Fin. Corp.</u>, 2011 WL 1296731, at *11 (M.D. Fla. Mar. 31, 2011) (same).

31

subject to CPLR 206(a), the Court refuted the suggestion that its ruling could somehow be used to put off the statute of limitations indefinitely. <u>See</u> <u>Continental</u>, 77 F.3d at 21. Rather, the Court stated that once the plaintiff suffered losses, it "could not unreasonably delay reporting those loses" to the defendant. <u>See</u> <u>Id.</u> (citation omitted). <u>Accord</u> <u>United States v. Gordon</u>, 78 F.3d 781, 787 (2d Cir. 1996) (holding "if a contract does not expressly limit a party's time to perform, courts routinely require performance within a reasonable time").

Here, the parties contractually agreed that the bargained-for "prompt notice" language of the MLPA would adequately serve as the gatekeeper for breach of contract claims involving failure to cure or repurchase. Tellingly, the MLPA does not say that a demand to cure or repurchase must be made within six years of when the Representations were made. The parties could have easily contracted for that period of time, as they had contracted for the 90-day cure and repurchase period and the two-year period in which to substitute loans (<u>i.e.</u>, "in no event shall any such substitution occur later than the second anniversary of the Closing Date"). (JA 41; MLPA § 6(e)). ***Instead, JPMorgan agreed that both its Representations and obligation to cure or repurchase the Loan would survive the life of the Loan until the PSA terminated***. (JA 44; MLPA § 14). The "prompt notice" requirement is the gatekeeper that governs the timeliness of a notice/demand to cure or repurchase during the life of the Loan.

### C.    The Cases Relied Upon By The District Court In Determining That The Demand At Issue Was Procedural Are Inapposite

The District Court relied on two cases when it determined that the Trust's demand was procedural:   (1) <u>ACE Sec. Corp. v. DB Structured Prods.</u>, 977 N.Y.S.2d 229 (N.Y. App. Div. 2013); and (2) <u>Structured Mortg. Trust 1997-2 v. Daiwa Fin. Corp.</u>, 2003 WL 548868 (S.D.N.Y. Feb. 25, 2003).[14]   Both of these cases are inapposite.

In <u>ACE</u>, an intermediate appellate court merely upheld established New York precedent that rejects the "discovery rule" in determining when a cause of action for breach of contract accrues.  <u>ACE</u>, 977 N.Y.S.2d at 231.  In that case, ***the plaintiff argued that the statute of limitations <u>did not begin to run until it discovered the breach</u> and defendant refused to repurchase the loan at issue.***  <u>Id.</u> Unlike here, the plaintiff in <u>ACE</u> did not allege that its right to demand repurchase existed only as of a later date.   There was also no briefing by the parties or discussion by the court about the material and adverse effect condition that exists in this case.  <u>See</u> <u>infra</u> Section IV.A.  <u>ACE</u> ultimately turned on the plaintiff's lack of standing to bring suit.  <u>Id.</u> ("In any event, the certificate holders lacked standing

---

[14] The District Court also cited to <u>Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.</u>, 18 N.Y.3d 765, 771 (N.Y. 2012) when summarizing New York law involving contractual demand provisions.  <u>Hahn</u> is distinguishable from the present case because there the defendant company acknowledged that it had the right to demand payment under a contract years earlier, but inadvertently failed to make such a demand.

to commence the action on behalf of the trust."). <u>ACE</u> simply has no application here.[15]

<u>Daiwa</u> did not even involve a repurchase claim or a demand to the loan seller that it cure or repurchase the loan at issue. Judge Stein, in fact, recognized the viability of such a repurchase claim when he noted that the purchaser of the loan "***opted not to pursue its repurchase claim***." 2003 WL 548868, at *1 (emphasis added). The facts and context of <u>Daiwa</u> are wholly distinguishable.

<u>Daiwa</u> involved an action in which certificateholders of a trust made a demand in accordance with a no-action clause on the trustee to file a lawsuit on their behalf for breaches of two factual representations and warranties relating to the transaction: the occupancy rate and the debt service coverage ratio. <u>Id.</u> at *2. ***Unlike here, the demand at issue in <u>Daiwa</u> was a demand on the trustee to initiate an action on behalf of the certificateholders***. In reviewing the language of the no-action clause, the court concluded that the certificateholders' demand was not an essential element to the existence of their cause of action for breaches of the representations and warranties. <u>Id.</u> at *2-3.

---

[15] While intermediate appellate decisions receive "proper regard," this Court is bound only to "give full weight to the decisions of the state's highest court," the New York Court of Appeals. <u>See</u> <u>Caronia v. Philip Morris USA, Inc.</u>, 715 F.3d 417 (2d Cir. 2013). The first federal district court in the Southern District of New York that was presented with the <u>ACE</u> decision and asked to reconsider its earlier ruling in which it found that limitations ran from the time of failure to cure or repurchase refused to change its ruling: ***<u>ACE</u> "does not change [the court's] views that the contract was breached not at the time of closing but at the time of failure to cure***." (JA 158-159); <u>Federal Housing Finance Agency v. WMC Mortg., LLC</u>, Case No. 1:13-cv-0584-AKH (S.D.N.Y. Jan. 7, 2014), Dkt. 59.

The <u>Daiwa</u> court explained that the cause of action began to accrue when the representations were made because it was undisputed that the actionable breach occurred when the representations and warranties were made and there was "no bar to the plaintiffs making a demand of the Trustee" at that same time. <u>Id.</u> There was no briefing by the parties or discussion by the <u>Daiwa</u> court about the material and adverse effect condition that is the required second element of the Trust's claim here. Moreover, like <u>ACE</u>, the court in <u>Daiwa</u> rejected the argument that the cause of action did not begin to accrue until the breach was ***discovered***. <u>Id.</u> at *2 (holding that the claim accrues "when the wrong is committed, and not when the plaintiff ***discovers it***").

In stark contrast to <u>Daiwa</u>, the Trust does not allege that its claims did not begin to accrue until it discovered JPMorgan's breaches. The "discovery rule" is not at issue here.[16] Further, unlike <u>Daiwa</u>, this case does not involve a no-action clause or factual Representations. Additionally, the Trust does not have a cause of action against JPMorgan for its breaches of the Representations that cause a material and adverse effect because the Trust is bound by the sole remedy

---

[16] In a letter submission, JPMorgan brought to the District Court's attention <u>Lehman XS Trust v. Greenpoint Mortgage Fund., Inc.</u>, 2014 WL 108523, at *4 (S.D.N.Y. Jan. 10, 2014), which is also on appeal. Although there are certain similar legal arguments in <u>Greenpoint</u> that are raised in this appeal, <u>Greenpoint</u> is distinguishable because, among other things, that case involves the "discovery rule" and there was no allegation raised by the plaintiff that its right to demand cure or repurchase only existed as of a later date because the loan seller's breaches did not materially and adversely affect the value of the loan at a point in time subsequent to the securitization closing. <u>Greenpoint</u> also does not involve a sole remedy provision and the defined terms in the <u>Greenpoint</u> contract are different.

35

provision in the MLPA to request a cure or repurchase.  As such, the Trust's claims did not begin to accrue until JPMorgan refused to honor its contractually negotiated right to cure or repurchase.

## IV.   THE TRUST WAS *NOT* ENTITLED TO DEMAND CURE OR REPURCHASE WHEN JPMORGAN SOLD THE LOAN AND MADE ITS REPRESENTATIONS IN 2002

Even if CPLR 206(a) applies to the Trust's demand to cure or repurchase because the demand is procedural (which it is not), the right to make that demand was not "complete," as required by CPLR 206(a), until JPMorgan's breaches of Representations materially and adversely affected the value of the Loan and such breaches had gone uncured.

Under New York law, a breach of contract claim accrues only once "all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court[.]"  Aetna Life & Cas. v. Nelson, 67 N.Y.2d 169, 175 (N.Y. 1986).  "[W]hen the right to final payment is subject to a condition, the obligation to pay arises and the cause of action accrues, only when the condition has been fulfilled."  John J. Kassner & Co. v. City of New York, 46 N.Y.2d 544, 550 (N.Y. 1979).  Parties to a contract are free to agree upon conditions, and JPMorgan contractually agreed to the material and adverse effect condition and the opportunity to cure.  Thus, the Trust's cause of action did not accrue until JPMorgan's breaches caused a material and adverse impact and JPMorgan refused

36

to cure its breaches.  See Sunoco, Inc. v. 175-33 Horace Harding Realty, 969 F.

Supp. 2d 297, 304-05 (S.D.N.Y. 2013) (explaining that, pursuant to the terms of

the parties' contract, the plaintiff's cause of action for breach of contract did not

accrue until a third-party consultant issued an environmental report with findings

and the defendant refused to pay).

### A.     A Material And Adverse Impact Must Exist Before The Trust Can Make A Demand To Cure Or Repurchase

The language in the MLPA is clear.  There needs to be both a breach and

material and adverse impact on the Trust to trigger JPMorgan's obligation to cure

or repurchase:

> (d)  Pursuant to this Agreement or the Pooling and Servicing Agreement, the Seller and the Purchaser shall be given notice of any **Breach** or Defect *that materially and adversely affects the value of such Mortgage Loan, the related Mortgaged Property or the interests of any of the holders of the Certificates therein.*
>
> (e) *Upon notice pursuant to Section 2.03(b) of the [PSA] and Section 6(d) herein, the Seller shall, not later than the earlier of 90 days from the Seller's receipt of the notice or the Seller's discovery of such Breach or Defect*, (i) cure such Defect or Breach, as the case may be, in all material respects, [or] (ii) *repurchase the affected Mortgage Loan at the applicable Repurchase Price* (as defined below) . . . .

(JA 41-42; MLPA § 6(d)–(e)).  In addition to the contract language, CMBS

caselaw instructs that a material and adverse effect needs to be present in addition

to a breach for the Trust's cause of action to accrue.  See, e.g., Lehman XS Trust v.

Greenpoint Mortgage Fund., Inc., 2014 WL 108523, at *4 (S.D.N.Y. Jan. 10,

2014) (the "alleged underlying breach occurred when the Trust experienced a 'material and adverse' effect");[17] <u>LaSalle Bank v. CIBC Inc.</u>, 2011 WL 4943341, at *3 (S.D.N.Y. Oct. 17, 2011) (the MLPA provides that an actionable breach must have a "material and adverse effect" on the property, the loan, or the interests of investors); <u>LaSalle Bank v. Citicorp Real Estate, Inc.</u>, 2002 WL 31729632, at *3 (S.D.N.Y. Dec. 5, 2002) (to "state a claim, LaSalle must allege both a breach of a representation or warranty ... and a material and adverse effect caused by the breach").

JPMorgan agrees.  During oral argument, counsel for JPMorgan agreed that there must be a determination of material and adverse effect in addition to the breach.  (JA 95).  In another case, JPMorgan has also acknowledged and recognized that for a repurchase claim to be actionable a material and adverse effect must be present: "*the obligation to give notice to cure or repurchase arises only when the breach 'materially and adversely affects' the value of the underlying loan*."  (JA 128, 138) (emphasis added).  JPMorgan has characterized the material and adverse impact element as "*essential*" to a repurchase claim.  (JA 95, 138-139) (emphasis added).

---

[17]   Unlike here, in <u>Greenpoint</u> there was no allegation raised by the plaintiff that its right to demand cure or repurchase only existed as of a later date because the loan seller's breaches did not materially and adversely affect the value of the loan at a point in time subsequent to the securitization closing.

38

1.     The District Court's Factual Conclusion That A Material And Adverse Impact Existed In 2002 Was Contrary To The Allegations Pled In The Complaint

Although the District Court agreed that material and adverse effect was a condition that needed to be satisfied, it improperly failed to accept as true the allegations pled in the Complaint, improperly resolved factual disputes, and drew inferences against the Trust.[18]  This was error.  See Staehr v. Hartford Fin. Servs. Group., Inc., 547 F.3d 406, 426 (2d Cir. 2008) (vacating dismissal after concluding lower court could not rule "as a matter of law" against plaintiff on statute of limitations defense); Valdez ex rel. Donely v. United States, 518 F.3d 173, 182 (2d Cir. 2008) (reversing order of dismissal on statute of limitations and remanding to "develop the record sufficiently").

*The Trust alleged that JPMorgan's breaches did not have the requisite material and adverse effect until 2009*.  (JA 15-17, 19-22; Compl. ¶¶ 33-45, 54-57, 64 & 71).  When JPMorgan sold the Loan and made its Representations about the Loan in 2002, the Highland Mall was a first class mall with the Anchor Stores occupied by retail giants J.C. Penney's, Dillard's, and Macy's.  (JA 15; Compl.

---

[18] For example, the District Court stated:  "The First Class Mall Restriction, [the Trust] urges, was 'impossible to satisfy' and therefore a 'fatal flaw at origination.'  Surely a fatally flawed loan is one whose value is materially and adversely affected."  (JA 118).  The "impossible to satisfy" allegation was made in the context of the closure of the Anchor Stores and the additional events that came into existence after the Loan was sold in 2002.  Further, the "fatal flaw" allegation was directed towards JPMorgan's origination of the Loan, and in any event, the value of a loan that is the subject of shoddy origination is not always immediately and necessarily materially and adversely impacted.  The District Court improperly drew inferences against the Trust.

39

¶ 33).    At that time, although JPMorgan's Representations were untrue, JPMorgan's breaches of the Representations had not had a material and adverse effect on the value of the Loan or the Leased Property to trigger JPMorgan's obligation to cure or repurchase the Loan and may never have had a material and adverse effect on the Trust.  (JA 15-16; Compl. ¶¶ 29, 33, 36).

It was not until the retail Anchor Stores closed (the first of which closed in October 2006), causing a direct adverse impact on the viability of the Leased Property, and AGLA asserted that a default existed under the Ground Lease in 2009 that JPMorgan's breaches of the Representations materially and adversely affected the value of the Loan and Leased Property.  (JA 15-17, 19-22; Compl. ¶¶ 33-45, 54-57, 64 & 71).[19]  It was these events, none of which existed in 2002, that when combined with the First Class Shopping Mall Restriction interfered with the Trust's ability to sell/assign its collateral and severely limited Loan workout options.  (Id.)  Prior to these events, JPMorgan's breaches of the Representations simply had no material and adverse impact on the value of the Loan or the Leased Property.

---

[19] For example, in the context of a motion to dismiss, the District Court should have inferred that because AGLA had not declared a default under the Ground Lease until 2009 prior to that time the inline portion of the mall satisfied the First Class Shopping Mall Restriction.

2.    The District Court's Determination On A Motion To Dismiss That A Theoretical Risk Of Loss Existed In 2002 That Satisfied The Material And Adverse Condition Was Flawed

In a letter submission to the District Court, JPMorgan argued that its breaches of the Representations resulted in a theoretical "risk of loss" to the Trust when the Loan was sold in 2002 and such theoretical "risk of loss" satisfied the material and adverse requirement.[20]  See Stipulation and Order, Docket No. 31-2, at p. 4.  Because it was a motion to dismiss, JPMorgan presented no evidence establishing that its breaches caused a "risk of loss" to the value of the Loan or the Leased Property in 2002 or that such theoretical "risk of loss" satisfied the material and adverse condition.  The District Court, however, improperly and inexplicably accepted as true JPMorgan's argument and based its decision on that assertion as a "factual conclusion."  (JA 117-119).  This was improper.

*First*, as discussed above, the Trust did not allege that JPMorgan's breaches caused a material and adverse effect because its "risk of loss" increased.  Rather, the Trust alleged that, upon the occurrence of the events described above (i.e., the closure of the Anchor Stores, the corresponding adverse impact to the Leased Property caused by such closures, and the allegations of default under the Ground Lease by AGLA due to the First Class Shopping Mall Restriction), JPMorgan's

---

[20]  JPMorgan made this argument purely for its statute of limitations defense.  To this day, JPMorgan argues that no material and adverse impact occurred.  (JA 58, 76 & 96).  JPMorgan should not be permitted to simultaneously contend that limitations has run when it disputes that a condition precedent to a cause of action ever existed.

41

breaches of the Representations interfered with the Trust's ability to transfer or assign its collateral, reposition the Leased Property, and workout the Loan. (JA 15-17, 19-22; Compl. ¶¶ 33-45, 54-57, 64 & 71). Further, without control over the Anchor Stores, the Trust could not ensure that they were operating at all times in a way that preserved the retail nature of the mall and supported the retail occupancy of the Leased Property in order to satisfy the First Class Shopping Mall Restriction. (JA 19-20; Compl. ¶¶ 54, 55). These facts go to the condition of material and adverse impact. The District Court was required to accept as true these allegations and give all favorable inferences to the Trust. The District Court failed to do this.

At a minimum, JPMorgan's Motion to Dismiss should have been denied so that discovery could go forward on when the Trust sustained a material and adverse impact on account of JPMorgan's breaches. See Bice v. Robb, 324 F. App'x 79, 81 (2d Cir. 2009) (reversing and remanding because the question of whether the statute of limitations had run "turns on a number of unresolved issues of fact that would benefit from discovery."); D'Antonio v. Metro Transp. Auth., 2008 WL 582354, at *9 (S.D.N.Y. Mar. 4, 2008) (refusing to dismiss one of the contract claims based on statute of limitations because defendant's contention that breach occurred at a particular point in time was not evident from the facts alleged in the complaint).

42

**Second**, if "risk of loss" was the condition that the Trust needed to satisfy in order for JPMorgan to be obligated to cure or repurchase, the MLPA would have said so.  See In re Musicland Holding Corp., 386 B.R. 428, 438 (S.D.N.Y. 2008) aff'd, 318 F. App'x 36 (2d Cir. 2009) (under New York law, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing").  It strains credulity that JPMorgan had an obligation to repurchase a $71 million Loan because its breaches **might have caused a theoretical "risk of loss" to the Trust.**  Indeed, this interpretation runs contrary to the very purpose of the condition which is to protect mortgage loan sellers like JPMorgan against "frivolous" demands grounded in a theoretical material adverse impact.  As JPMorgan aptly said, there must be a "**demonstrable material and adverse effect on the value**" of the Loan. (JA 127).  By its very nature, a theoretical **risk** of loss cannot equate to material and adverse effect.  Further, if "risk of loss" were the standard, then the "material and adverse effect" condition would be utterly meaningless because anytime a loan is sold there is a theoretical risk of loss to the buyer of that loan.  See Bluebird Partners, L.P. v. First Fidelity Bank, N.A., N.J., 671 N.Y.S.2d 7, 12 (N.Y. App. Div. 1998) (courts are to "enforce the plain meaning of an unambiguous agreement . . . rather than to accept a construction that would render a purposeful provision of the contract meaningless").

In a similar repurchase case, a federal court applying New York law denied summary judgment because, although the facts established that breaches of the contract occurred, there remained genuine disputes of fact as to whether such breaches materially and adversely affected the Trust.  See CIBC, 2011 WL 4943341, at *4.  Other courts have also denied summary judgment on the meaning of contract terms like "material adverse effect" or "material adverse change" in financial contracts.  See e.g., Rus, Inc. v. Bay Indus., Inc., 322 F. Supp. 2d 302, 313 (S.D.N.Y. 2003) ("Because the parties have advanced two possible readings of the contract, neither of which is clearly in error, the Agreement's definition of a material adverse effect is ambiguous . . . and the trier of fact will have to resolve questions of fact . . . ."); Greenwood Place, LP v. Huntington Nat'l Bank, 2011 U.S. Dist. LEXIS 78736, at *11-18 (S.D Ind. July 19, 2011) (denying summary judgment on issue of whether there had been a "material adverse change" in financial condition of guarantor).

**Finally**, contrary to the District Court's belief, there simply is not a "growing consensus among New York courts" holding that material and adverse effect "repurchase conditions are triggered when the plaintiff's risk of loss increases."  (JA 118-119).  For this proposition, the District Court cited four insurance cases in which the courts, three of which were decided on summary judgment after discovery had closed, refused to accept the loan sellers' contention

44

that to establish causation for damages the plaintiff needed to show that the sellers' breaches caused the loans at issue to default.[21]  No such contention is made in this case.[22]

In each of those cases, which involved insurance companies and insurance policies, the courts held that it was sufficient for the insurers to show that the sellers' breaches caused a material and adverse effect if their overall risks of loss on their insurance policies increased.  See supra n. 21.  The instant case does not involve an insurance company or insurance policy and the "risk of loss" discussion in the insurance cases relied upon by the District Court has no application here.

---

[21] See Syncora Guar. Inc. v. EMC Mortg. Corp., 874 F. Supp. 2d 328, 339-40 (S.D.N.Y. 2012) (granting partial summary judgment after discovery and noting that when seller "allegedly breached those warranties, Syncora's overall risk of loss on the Policy increased"); Assured Guar. Mun. Corp. v. Flagstar Bank, FSB, 892 F. Supp. 2d 596, 602 (S.D.N.Y. 2012) ("Following discovery, [defendant] moved for summary judgment . . . ." and, citing to Syncora, held that "a breach of contract that materially increased Assured's risk of loss would be adverse, because it was opposed to the insurer's interests"); and MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 963 N.Y.S.2d 21, 22-23 (N.Y. App. Div. 2013) (modifying in part summary judgment, citing to Syncora and Assured, and holding that loan need not be in default to trigger obligation to repurchase).  In the fourth case, Howard Residential, Inc. v. Sand Canyon Corp., 2014 WL 572722 (S.D.N.Y. Feb. 14, 2014), the court simply held that, on a Rule 12(b)(6) motion, plaintiff's allegations that defendant's breaches "created an increased credit risk" satisfied the material and adverse effect condition to withstand dismissal.  As noted above, the Trust did not make any similar type of allegation in its Complaint.

[22] Notwithstanding the allegations as pled in the Complaint, the District Court stated that the Trust argued "no material and adverse effect was present until [loan] default occurred in 2009," and the Trust "asks this Court to read the [material and adverse effect] requirement as an agreement between the parties that a cause of action would not accrue until JPMorgan's breach resulted in a tangible loss."  (JA 117-119).  *The Trust never made these allegations or argued these points*.  The District Court did not cite any paragraph from the Complaint because these allegations were never made.  The District Court's discussion relating to the material and adverse condition simply has no basis in the facts as alleged.

3.  The Presence Of The Language – "that would materially and adversely effect" – In One Of The Representations That JPMorgan Breached Is Irrelevant To The Statute Of Limitations Argument

JPMorgan argued that because the words "that would materially and adversely effect" are included in one of the Representations that it breached, it necessarily follows that the material and adverse effect condition must have been satisfied when the Representation was made in 2002. This argument is a red-herring. To be clear, the Representation provides in relevant part: "such Ground Lease . . . does not restrict the use of the related Mortgaged Property by such lessee, its successors or assigns, *in a manner that would materially and adversely affect the security provided by the Mortgage*; . . . (JA 14, 18-19; Compl. ¶¶ 27, 51 and JA 48; MLPA (xx(1)) (emphasis added). The Representation clearly contemplates a possible *future* material and adverse effect: "*that would* materially and adversely affect the security provided by the Mortgage." The fact that such language is included in the Representation does not, as JPMorgan urges, demonstrate that the material and adverse effect condition was satisfied when the Representation was made in 2002.

Once again, no right to request cure or repurchase came into existence until an event occurred that caused a demonstrable material and adverse effect. Those facts arose in 2009 upon the allegation of a Ground Lease default by AGLA, the

46

closure of the retail Anchor Stores, and the corresponding adverse impact suffered by the Leased Property. (JA 15-17, 19-22; Compl. ¶¶ 33-45, 54-57, 64 & 71).

## B.    JPMorgan Contractually Required That It Be Given An Opportunity To Cure

Ironically, the provisions JPMorgan relied upon before the District Court below were intended to protect against frivolous claims (i.e., the absence of material and adverse impact) and litigation (i.e., without an opportunity to cure). JPMorgan has stated in other mortgage-backed securities litigation that the opportunity to cure is a condition precedent to the accrual of a repurchase claim:

> By express agreement, not every alleged breach of a representation or warranty gives rise to a notice or repurchase obligation. Rather, the obligation to give notice to cure or repurchase arises *only* when the breach 'materially and adversely affects' the value of the underlying loan . . . ***Only then, after establishing that a breach that had a material and adverse effect on a specified loan has gone uncured, does the obligation to 'repurchase such Mortgage Loan' even arise***.
>
> *        *        *        *
>
> ***[T]he Seller's repurchase obligation only arises 90 days after the Trustee's delivery of notice of breaches and the Seller is given the opportunity to cure. . . .   There is a good reason for this requirement. . . .  The Trustee should have found an actual breach, and the Seller should have an opportunity to address the alleged breach before anyone is hauled into court.***

(JA 128, 138, 140-141) (emphasis added).

The Trust's right to make its notice/demand was not "complete" under CPLR 206(a) until JPMorgan's opportunity to cure (the "**Cure Period**") had

expired and JPMorgan had received its contractually mandated opportunity to cure.

See ACE, 977 N.Y.S.2d at 231 (holding that opportunity to cure is a condition precedent to repurchase claim). JPMorgan was not obligated to repurchase the Loan until the Cure Period expired without cure. (JA 41-42; MLPA § 6(e) and JA 32-33; PSA § 2.03(b)). As a result, JPMorgan's "obligation to pay arises and the cause of action accrues, only when the condition" – i.e., the lapse of the Cure Period – "has been fulfilled." Kassner. The Trust asked JPMorgan to cure its breaches in December 2010, and JPMorgan refused to cure in January 2011. Thus, the Trust's claims are timely.

## CONCLUSION

For the reasons set forth above, the Opinion of the District Court and judgment of dismissal should be reversed in their entirety.

8243603

Dated:       June 16, 2014


**VENABLE LLP**

By:    __/s/ Gregory A. Cross_____
         Gregory A. Cross
         Colleen M. Mallon
         750 E. Pratt Street, Suite 900
         Baltimore, MD 21202
         Phone: (410) 244-7400
         Email:  gacross@venable.com
                cmmallon@venable.com

*Attorneys for Plaintiff-Appellant*

# CERTIFICATE OF COMPLAINCE WITH RULE 32(a)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,684 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Times New Roman.

Dated:       June 16, 2014
             Baltimore, Maryland

                          VENABLE LLP

                          ___/s/ Gregory A. Cross_____
                          Gregory A. Cross
                          Colleen M. Mallon
                          750 E. Pratt Street, Suite 900
                          Baltimore, MD 21202
                          Phone: (410) 244-7400
                          Fax:   (410) 244-7742